UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GREGORY CROSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:07-cv-0132-DFH-TAB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant.[1] | ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Gregory Cross seeks judicial review of a final decision by the
Commissioner of Social Security denying his application for disability insurance
and supplemental security income benefits.  Acting for the Commissioner,
Administrative Law Judge ("ALJ") Lauren R. Mathon determined that Mr. Cross
was not disabled under the Social Security Act because he retained the residual
functional capacity to perform medium exertional work that did not require use
of his non-dominant left hand.  As explained below the ALJ's decision is supported
by substantial evidence and is therefore affirmed.

*Background*

---

[1]Michael J. Astrue took office as Commissioner of the Social Security
Administration while Mr. Cross' case was pending before the court. Commissioner
Astrue is substituted as the defendant in this action pursuant to Rule 25(d)(1) of
the Federal Rules of Civil Procedure.

Mr. Cross was born in 1967 and was 38 years old when the ALJ rendered a decision in his application for Social Security benefits.  Mr. Cross has a tenth grade education and is able to read the newspaper.  R. 141.  He has worked as a street sweeper, floor scrubber, self-employed contractor, tire changer, delivery driver, warehouse worker, and as a swing shift worker at a wastewater treatment facility.  R. 166-67.  Each of these jobs required full use of both of his hands.  R. 167-68.  He last worked in August 2002 and claims that he became disabled on August 18, 2002.  R. 93, 156.  He received unemployment benefits for ten to twelve months beginning in August 2002.  While he was receiving unemployment benefits, Mr. Cross sought work in construction and in restaurants.  R. 157.

I.    *Medical Record*

On November 17, 2000, Mr. Cross was released from the care of Orthopaedics Indianapolis by Dr. Kevin Scheid after being treated for a fracture to his tibia.  R. 113.  He was instructed to keep his dressing clean and dry, to change the dressing on the pins in his leg once a day, to take Vicodin for the pain, and to take an aspirin a day to prevent blood clots.  R. 113.  He was permitted to walk with a walker or crutches and was not to bear any weight with his left leg.  Dr. Scheid instructed Mr. Cross to return for a follow-up appointment on November 29, 2000.  R. 113.  The available records do not reflect whether Mr. Cross returned to Dr. Scheid.

In December 2001, Mr. Cross was examined by Dr. David Batt of the Clarian Health Arthritis Care Center.  R. 101.  Dr. Batt noted that Mr. Cross was suffering from rheumatoid arthritis.  About a year earlier, when Mr. Cross was being treated by Dr. Scheid for his fractured tibia, Dr. Batt had seen Mr. Cross in consultation but Mr. Cross had not returned for a follow-up appointment.  R.101. In his December 2001 exam, Dr. Batt noted that in the time since that consult visit, Mr. Cross was having increased pain in his joints and in the nodules in his elbows.  He had active synovitis in the small joints of his hands and wrists but not in his legs.  He was taking Aleve over the counter but stated it was not helping his pain.  Dr. Batt instructed Mr. Cross to stop taking Aleve and to take Naprosyn and prednisone, and he counseled Mr. Cross concerning his need for disease-remitting drugs.  Dr. Batt treated Mr. Cross with a Kenalog injection.  Because Mr. Cross was uninsured, Dr. Batt discussed his follow-up options with him, suggesting that Mr. Cross could return to see Dr. Batt, could go to the residents clinic, or could go to the Wishard Clinic.

On March 31, 2004, Dr. Wail Bakdash, a consulting rheumatologist, examined Mr. Cross.  R. 102.  Dr. Bakdash remarked that Mr. Cross still suffered pain stemming from a fracture to his left tibia in November 2000.  Also, Mr. Cross suffered from rheumatoid arthritis in his hands, wrists, elbows, shoulders, and feet.  Mr. Cross was not taking any medication in spite of swelling in his wrists and finger joints and stiffness in his joints for more than half of the day.

-3-

Dr. Bakdash reported that Mr. Cross was able to make a fist and had a right hand grip of twelve pounds and a left hand grip of two pounds.  R. 102-03.  Mr. Cross was able to walk one block and climb a half flight of stairs.  Dr. Bakdash also noted that Mr. Cross could walk without assistance, did not have any clubbing, had a normal gait and posture, had no unsteadiness, was able to stand on his heels and toes with slight difficulty, and had a normal straight leg raise.  Dr. Bakdash remarked that Mr. Cross sometimes had difficulty performing minor tasks but was able to make a fist with each hand.  Also, Mr. Cross was able to grasp, lift, carry, and manipulate objects in both hands, and to perform repeated movements with both feet.  R. 102-3.  He could bend over without restriction and squat, sit, stand, and walk normally, although he had difficulty rising from a squatting position.  Dr. Bakdash noted that Mr. Cross' range of motion in his spine, upper extremities, and lower extremities was within the normal range.  R. 104.

On April 14, 2004, Dr. J. Gaddy completed a Physical Residual Functional Capacity Assessment based on the evidence available in Mr. Cross' medical file. R. 105-12.  Dr. Gaddy opined that Mr. Cross was able to lift fifty pounds occasionally and twenty-five pounds frequently, and that other than these restrictions, Mr. Cross' ability to push and pull with his hands or feet was unlimited.  R. 106.  He indicated that Mr. Cross was able to stand or walk for about six hours in an eight hour work day with normal breaks, but was able to sit for less than six hours in an eight hour work day.  R. 106.  Dr. Gaddy believed

that Mr. Cross suffered from no postural, manipulative, visual, communicative, or environmental limitations.  R. 107-09.

On October 31, 2005, Dr. Haroon Qazi, a consulting reconstructive hand surgeon, examined Mr. Cross.  R. 116-17.  Dr. Qazi described Mr. Cross as appearing to be in "some acute distress."  Dr. Qazi did not examine Mr. Cross' lower body.  R. 116.  Dr. Qazi reported that Mr. Cross suffered chronic pain and intolerance to cold in his left leg below the knee stemming from the accident that had broken his left tibia.  R. 116.  Dr. Qazi noted that Mr. Cross had suffered from problems with both hands since 1998, and at the time of his consult with Dr. Qazi, Mr. Cross complained of pain in both wrists and hands and limited feeling in his wrists and fingers.  R. 116.  Mr. Cross related to Dr. Qazi that he lacked strength in both hands and suffered from radiating pain from the side of his wrists to both hands.  R. 116.  Dr. Qazi noted the "obvious" presence of Heberden's nodules, caused by rheumatoid arthritis, affecting Mr. Cross' right elbow and left thumb.  R. 116.  Although Dr. Qazi did not examine any x-rays, he remarked that Mr. Cross had obvious subluxation of his radiocarpal joints in both wrists.  Mr. Cross' range of motion was severely limited at his wrist but he had adequate range of motion in the small joints of his fingers.  R. 116.  His grip strength was zero to two pounds, and his pinch strength was two pounds on his left hand and five pounds on his right hand.  In sum, Dr. Qazi wrote, "this patient is completely disabled as there is very little useful function in both hands.  We do advise that patient should consult a rheumatologist which will help somewhat with the pain

but again, I do not expect any miraculous recovery resulting in any useful return to any job." R. 117.

II.    *Testimony at the Hearing*

On October 11, 2005, Mr. Cross testified that he retained use in his right arm, estimating that he was able to use his right arm "about half" of what he once could. R. 144. Mr. Cross denied being able to lift anything with his left hand, and he estimated that he would be able to lift and carry up to ten or twenty pounds with his right hand. R. 150. He stated that he was right handed, and was able to write his name, but that in order to write a paragraph, he would have to take a break. R. 144-45. He said that he could not hold a coffee cup with his left hand but could slowly wiggle and painfully straighten the fingers on that hand. R. 145. He testified that he could not cut a two-inch steak and could not hold a spoon in his left hand, but could hold a spoon in his right hand. R. 145. He guessed that he would be able to hammer one or two nails with his right hand before needing to stop, and would not be able to change a flat tire. R. 151. He stated that he did not have full range of motion in his right wrist and was only barely able to move his left wrist. R. 151. To take care of his personal needs like dressing, he had "learned a life of one handedness." R. 145. He was able to button and zip his clothes with his right hand but not with his left hand. R. 145-46. He was able to drive a distance of sixty miles but would be exhausted. R. 146.

Mr. Cross also testified that he suffered from numbness in his left leg from his toes to his thigh.  R. 148.  He stated that he was unable to run and could walk for only fifteen or twenty minutes before he had to sit down and rest for five to ten minutes before walking again.  R. 148-49, 162.  He estimated that in an eight hour work day, he would be able to be on his feet either standing or walking for two to four hours.  R. 149, 162.  He estimated that he would be able to sit for about half an hour to an hour without needing to get up.  R. 163.

Mr. Cross testified that he had growths on his left elbow, right thumb, and on one of his little toes.  R. 154.  The growth on his left thumb was a quarter inch or a half inch on the inside, and the growth on his left elbow had been there for a few years and was growing.  R. 154.  Mr. Cross stated that these growths caused him pain when he bumped them.  R. 155.

Mr. Cross testified that he spent his days watching television, reading newspapers and magazines, and doing light housework such as cleaning up, making the bed, taking out the trash, and cooking quick meals that did not require opening jars.  R. 163.

Mr. Cross testified that he was examined by Dr. Batt in December 2002, and by Dr. Bakdash in March 2004, and stated that since March 2004 he had participated in a pain and stress management course but had received no other medical treatment.  R. 161.  In his pain and stress management course he learned

how to control his pain through relaxation and meditation, but he was not prescribed any medications. R. 161-62. He had not been offered any prescription medications, but would refuse them because he feared becoming addicted. R. 162.

Mr. Cross testified that his condition on the date of the hearing was worse than it had been between August 2002 (when he last worked) and August 2003. R. 158. Mr. Cross testified, however, that his condition on the date of the hearing was "roughly the same" as it had been when he was examined by Dr. Bakdash in March 2004. R. 142-43.

Ruth Van Vleet, a vocational expert, also testified at the hearing. She testified that a hypothetical individual of Mr. Cross' age, education, and vocational background who was able to do medium work but was limited to using only the dominant hand could work as a light delivery driver, unarmed security guard, or telemarketer. R. 168-71. If, however, the hypothetical individual was able to use his or her dominant hand for only ten minutes and then had to take a fifteen minute break, the individual could work as a light delivery driver or unarmed security guard. R. 172. If the hypothetical individual was able to walk or stand for only fifteen minutes at a time before needing a ten minute break, Ms. Van Vleet testified that the individual would not be able to work as either a light delivery driver or an unarmed security guard. R. 173.

*Framework for Determining Disability and the Standard of Review*

To be eligible for the disability insurance benefits and supplemental security income he seeks, Mr. Cross must establish that he suffered from a disability within the meaning of the Social Security Act.  To prove disability under the Act, the claimant must show that he is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than 12 months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  Mr. Cross was disabled only if his impairments were of such severity that he was unable to perform work that he had previously done and if, based on his age, education, and work experience, he also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to him in his immediate area, or whether he would be hired if he applied for work.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

To determine whether Mr. Cross was disabled under the Social Security Act, the ALJ followed the familiar five-step analysis set forth in 20 C.F.R. § 404.1520 and § 416.920.  The steps are as follows:

    (1)    Has the claimant engaged in substantial gainful activity?  If so, he was not disabled.

    (2)    If not, did the claimant have an impairment or combination of impairments that are severe?  If not, he was not disabled.

    (3)    If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

    (4)    If not, could the claimant do his past relevant work? If so, he was not disabled.

    (5)    If not, could the claimant perform other work given his residual functional capacity, age, education, and experience?  If so, then he was not disabled.  If not, he was disabled.

See generally 20 C.F.R. §§ 404.1520, 416.920.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

The ALJ found that Mr. Cross satisfied step one.  He had not engaged in any substantial gainful activity at any time relevant to the ALJ's decision.  At step two, the ALJ found that Mr. Cross had the following severe impairments:  status post fractures of his left tibia, rheumatoid arthritis, and tumor necrosis.  These impairments did not meet or equal any of the listings that would have

automatically qualified Mr. Cross for benefits at step three.  At step four, the ALJ determined that Mr. Cross was no longer able to perform his past relevant work.

At step five, the ALJ determined that Mr. Cross retained the residual functional capacity to perform medium exertional work that did not require him to use his non-dominant left hand.  Based on the testimony of the vocational expert, the ALJ found that a person with Mr. Cross' residual functional capacity would be able to work as a light messenger driver, telemarketer, or a security guard.  The ALJ therefore denied benefits.

The Social Security Act provides for judicial review of the Commissioner's denial of benefits.  42 U.S.C. §§ 405(g), 1383(c)(3).  Because the Appeals Council denied further review of the ALJ's findings, the ALJ's findings are treated as the final decision of the Commissioner.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court.  42 U.S.C. §§ 405(g), 1383(c)(3); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). The ALJ's decision must be based upon consideration of all the relevant evidence, and the ALJ must articulate at some minimal level her analysis of the evidence so that the court can trace adequately the path of the ALJ's reasoning. *Diaz*, 55 F.3d at 307-08.

## *Discussion*

I.   *Opinions of the Consulting Physicians*

Mr. Cross argues that the ALJ wrongfully gave greater weight to the opinion of Dr. Bakdash, the consulting physician who evaluated Mr. Cross on March 31, 2004, than to the opinion of Dr. Qazi, the consulting physician who evaluated him on October 31, 2005. Pl. Br. at 4-5. Mr. Cross believes that the ALJ erred by treating these two physicians' opinions as contradictory. He argues that instead

the ALJ should have considered these opinions as evidence of the progression of his condition.

Based on this record, Mr. Cross' theory that the differing opinions of Dr. Bakdash and Dr. Qazi support an inference regarding the deterioration of his condition does not show a reversible error by the ALJ.  On October 11, 2005, only twenty days before he was examined by Dr. Qazi, Mr. Cross testified that his condition then was "roughly the same" as it had been in March 2004 when he was examined by Dr. Bakdash.  R. 142-43.  Mr. Cross' argument that the difference of opinion between Dr. Bakdash and Dr. Qazi could be evidence of the progression of his condition is contradicted by his statement at the hearing and finds no other support in the record.  Here, the ALJ did not err in considering the opinions of Dr. Bakdash and Dr. Qazi as conflicting, without speculating about the possible interim progression of Mr. Cross' condition.

In the face of those conflicting opinions, the ALJ had the discretion – even the obligation – to weigh them against one another.  See *Caviness v. Apfel*, 4 F. Supp. 2d 813, 824 (S.D. Ind. 1998).  Social Security regulations confirm that the ALJ has the discretion to weigh conflicting medical opinions.  See 20 C.F.R. §§ 404.1527, 416.927.  In weighing conflicting medical opinions, the ALJ is obligated to take several factors into consideration, including whether the source has examined the claimant, whether the source is a treating physician, whether the opinion is properly supported, whether the opinion is consistent with the

record as a whole, and whether the source of the opinion is a specialist.   See 20 C.F.R. §§ 404.1527(d); 916.927(d).   In any case, the ultimate responsibility for determining disability remains with the Commissioner or ALJ.   See 20 C.F.R. §§ 404.1527(e)(1); 916.927(e)(1).

Here, the ALJ explained that she gave greater weight to the opinion of Dr. Bakdash because he was a specialist and because his opinion was consistent with the other evidence available in the record.   R. 21.   In contrast, Dr. Qazi was not a specialist and Dr. Qazi's opinion conflicted with the opinions of the other examining sources.   R. 21.   Dr. Qazi's opinion also conflicted with Mr. Cross' own testimony, in which he stated that his condition on the date of the hearing was "roughly the same" as it was when he was examined by Dr. Bakdash and that he retained some residual capacity in his right arm.   R. 142-44.   This was a reasonable explanation for the ALJ's resolution of the conflict.   The ALJ did not err in giving greater weight to the consulting opinion of Dr. Bakdash and discounting Dr. Qazi's opinion that Mr. Cross was totally disabled.

II.    *Credibility Determination*

Mr. Cross also asserts that it was improper for the ALJ to discount his credibility based on his failure to seek medical care or to take medication for his condition.   Pl. Br. 5-7.   The ALJ found that Mr. Cross' statements regarding his symptoms and resulting limitations were not fully credible because Mr. Cross

failed to pursue health care consistent with the degree of disability he claimed, noting that Mr. Cross provided no evidence of seeking or receiving treatment since his claimed onset date and that he took no medication to alleviate his condition. R. 21.  Although Mr. Cross claimed that he was unable to afford treatment and had no medical insurance, the ALJ noted that Mr. Cross received unemployment benefits from August 2002 to about July 2003 and was actively seeking work during this period.  R. 21.  The ALJ ultimately concluded that "without reasonable justification, the claimant made no significant efforts to obtain regular medical care that could have improved functional capacities.  His alleged pain and limitations are not corroborated by the objective medical evidence of record."  R. 21.  Mr. Cross argues that the ALJ erred in finding that his testimony was not credible on this basis.

Objective medical evidence is not necessary to support a claimant's allegations regarding the extent of his or her claimed symptoms, but neither the ALJ nor this court is "required to give full credit to every statement of pain, and require a finding of disabled every time a claimant states that she feels unable to work."  *Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996); *Pope v. Shalala*, 998 F.2d 473, 486 (7th Cir. 1993); accord, 20 C.F.R. §§ 404.1529(d), 416.929(d).

The ALJ must weigh the claimant's subjective complaints and the relevant medical evidence, as well as any other evidence of the following factors:

(1)    The claimant's daily activities;

(2)    Location, duration, frequency, and intensity of pain or other symptoms;

(3)    Precipitating and aggravating factors;

(4)    Type, dosage, effectiveness, and side effects of any medication;

(5)    Treatment, other than medication, for relief of pain or other symptoms;

(6)    Other measures taken to relieve pain or other symptoms;

(7)    Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Having considered these factors, which are intended to either corroborate or discredit the claimant's subjective complaints, the ALJ may make a reasoned credibility determination based upon the evidence about whether the claimant acts, day in and day out, like a person would act who is really suffering from the symptoms the claimant alleges. The court will not set aside an ALJ's credibility determination if there is some support in the record unless it is "patently wrong." *Luna*, 22 F.3d at 690; *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). This deference to an ALJ's credibility determination is especially justified when it "involves inarticulable elements 'that leave no trace that can be discerned in this or any other transcript.'" *Herron*, 19 F.3d at 335, quoting *Erhart v. Secretary of Health and Human Servs.*, 969 F.2d 534, 541 (7th Cir. 1991). "However, when such determinations rest on objective factors or fundamental implausibilities

rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision." *Herron*, 19 F.3d at 335, citing *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

The ALJ considered the factors described above in determining the weight to give Mr. Cross' account of his symptoms and limitations and found his subjective complaints "not fully credible." R. 21. In making this credibility determination, the ALJ considered Mr. Cross' testimony in light of the existence of inconsistent medical evidence and Mr. Cross' failure to pursue any medical treatment. Mr. Cross was diagnosed with rheumatoid arthritis in December 2001, and although examined by two consulting physicians since that diagnosis, the ALJ found that Mr. Cross had received absolutely no treatment for his condition and took no prescribed medications. Mr. Cross claimed that he was unable to afford treatment and had no medical insurance, but the ALJ noted that from August 2002 to about July 2003, Mr. Cross received unemployment benefits and was actively seeking employment. R. 21. Given this, the ALJ found that Mr. Cross' lack of treatment and medication was inconsistent with his claim of debilitating limitations and disability. R. 21.

Many courts, including the Seventh Circuit, have questioned the relevance of a claimant's failure to seek medical treatment, especially when he or she is unable to afford it. See, *e.g.*, *Herron v. Shalala*, 19 F.3d at 336 & n. 11 ("Lack of discipline, character, or fortitude in seeking medical treatment is not a defense to

a claim for disability benefits."), citing *DeFrancesco v. Bowen*, 867 F.2d 1040, 1044 (7th Cir. 1989); *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989) (ALJ should consider in first instance whether lack of financial resources is claimant's motivation for failing to seek medical attention); *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) (discrediting claimant's complaints of disabling pain was erroneous where claimant's testimony that she could not afford further treatment was uncontradicted by the record).

Here, the ALJ considered Mr. Cross' testimony that he was unable to afford treatment but found that testimony to be contradicted by his receipt of unemployment benefits from August 2002 to about July 2003. R. 21. This minimal review of Mr. Cross' ability to afford treatment might otherwise be insufficient to dismiss altogether his subjective account of his condition and limitations, but Mr. Cross failed to present any evidence to support his assertion that he was unable to afford treatment. Additionally, Mr. Cross' failure to seek medical treatment was not the only basis on which the ALJ discounted Mr. Cross' subjective account. The ALJ also considered Mr. Cross' testimony concerning his daily activities, his testimony that he actively sought employment while he claimed to be totally disabled, his refusal to take medication, and the available objective medical evidence. R. 21. This evidence, in total, provided sufficient grounds for the ALJ's conclusion that Mr. Cross' subjective account of his limitations was inconsistent with the weight of the available objective evidence. R. 21. The ALJ

did not err by finding that Mr. Cross' testimony concerning his functional limitations was not fully credible.

III.   *Residual Functional Capacity*

Mr. Cross argues that the ALJ erroneously failed to provide support for his determination that Mr. Cross was unable to use his non-dominant left hand and was capable of performing medium exertional work. Pl. Br. 7. Mr. Cross points to the opinion of Dr. Qazi, who in October 2005 opined that Mr. Cross had no useful function in either of his hands. Mr. Cross argues that the ALJ's failure to consider this line of evidence was error. Pl. Br. 7.

Mr. Cross is correct that an ALJ must consider all lines of evidence in reaching his or her determination. See *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). However, here the ALJ did not fail to consider a line of evidence. As explained above, the ALJ discussed and considered Dr. Qazi's opinion but ultimately gave it little weight. R. 21. In doing so, the ALJ explained that Dr. Qazi was not a specialist and that Dr. Qazi's opinion conflicted with the other evidence available in the record. R. 21. As noted, Dr. Qazi's opinion conflicted with Mr. Cross' own testimony that his condition on the date of the hearing was "roughly the same" as it was when he was examined by Dr. Bakdash, and that he retained some residual capacity in his right arm. R. 142-44. Giving

little weight to evidence is very different from altogether failing to consider evidence, and Mr. Cross' argument fails.

Mr. Cross also argues that it is impossible to ascertain the ALJ's rationale for her ultimate determination regarding his residual functional capacity. The court disagrees. In establishing Mr. Cross' residual functional capacity, the ALJ explained her reliance on Mr. Cross' testimony that his left, non-dominant arm is "useless" but that he retains limited use of his dominant right arm and hand, and on the opinion of Dr. Bakdash. R. 21. On this record, the ALJ's articulation of her analysis was sufficient.

*Conclusion*

For the foregoing reasons, the ALJ's decision denying benefits is supported by substantial evidence and does not reflect a legal error that would require remand. Accordingly, the decision is affirmed and final judgment will be entered.

Date: February 29, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Tom Kieper

UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GREGORY CROSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:07-cv-0132-DFH-TAB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant.[1] | ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Gregory Cross seeks judicial review of a final decision by the Commissioner of Social Security denying his application for disability insurance and supplemental security income benefits.   Acting for the Commissioner, Administrative Law Judge ("ALJ") Lauren R. Mathon determined that Mr. Cross was not disabled under the Social Security Act because he retained the residual functional capacity to perform medium exertional work that did not require use of his non-dominant left hand.  As explained below the ALJ's decision is supported by substantial evidence and is therefore affirmed.

*Background*

---

[1]Michael J. Astrue took office as Commissioner of the Social Security Administration while Mr. Cross' case was pending before the court.  Commissioner Astrue is substituted as the defendant in this action pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

Mr. Cross was born in 1967 and was 38 years old when the ALJ rendered a decision in his application for Social Security benefits.  Mr. Cross has a tenth grade education and is able to read the newspaper.  R. 141.  He has worked as a street sweeper, floor scrubber, self-employed contractor, tire changer, delivery driver, warehouse worker, and as a swing shift worker at a wastewater treatment facility.  R. 166-67.  Each of these jobs required full use of both of his hands.  R. 167-68.  He last worked in August 2002 and claims that he became disabled on August 18, 2002.  R. 93, 156.  He received unemployment benefits for ten to twelve months beginning in August 2002.  While he was receiving unemployment benefits, Mr. Cross sought work in construction and in restaurants.  R. 157.

I.    *Medical Record*

On November 17, 2000, Mr. Cross was released from the care of Orthopaedics Indianapolis by Dr. Kevin Scheid after being treated for a fracture to his tibia.  R. 113.  He was instructed to keep his dressing clean and dry, to change the dressing on the pins in his leg once a day, to take Vicodin for the pain, and to take an aspirin a day to prevent blood clots.  R. 113.  He was permitted to walk with a walker or crutches and was not to bear any weight with his left leg.  Dr. Scheid instructed Mr. Cross to return for a follow-up appointment on November 29, 2000.  R. 113.  The available records do not reflect whether Mr. Cross returned to Dr. Scheid.

In December 2001, Mr. Cross was examined by Dr. David Batt of the Clarian Health Arthritis Care Center. R. 101. Dr. Batt noted that Mr. Cross was suffering from rheumatoid arthritis. About a year earlier, when Mr. Cross was being treated by Dr. Scheid for his fractured tibia, Dr. Batt had seen Mr. Cross in consultation but Mr. Cross had not returned for a follow-up appointment. R.101. In his December 2001 exam, Dr. Batt noted that in the time since that consult visit, Mr. Cross was having increased pain in his joints and in the nodules in his elbows. He had active synovitis in the small joints of his hands and wrists but not in his legs. He was taking Aleve over the counter but stated it was not helping his pain. Dr. Batt instructed Mr. Cross to stop taking Aleve and to take Naprosyn and prednisone, and he counseled Mr. Cross concerning his need for disease-remitting drugs. Dr. Batt treated Mr. Cross with a Kenalog injection. Because Mr. Cross was uninsured, Dr. Batt discussed his follow-up options with him, suggesting that Mr. Cross could return to see Dr. Batt, could go to the residents clinic, or could go to the Wishard Clinic.

On March 31, 2004, Dr. Wail Bakdash, a consulting rheumatologist, examined Mr. Cross. R. 102. Dr. Bakdash remarked that Mr. Cross still suffered pain stemming from a fracture to his left tibia in November 2000. Also, Mr. Cross suffered from rheumatoid arthritis in his hands, wrists, elbows, shoulders, and feet. Mr. Cross was not taking any medication in spite of swelling in his wrists and finger joints and stiffness in his joints for more than half of the day.

Dr. Bakdash reported that Mr. Cross was able to make a fist and had a right hand grip of twelve pounds and a left hand grip of two pounds.  R. 102-03.  Mr. Cross was able to walk one block and climb a half flight of stairs.  Dr. Bakdash also noted that Mr. Cross could walk without assistance, did not have any clubbing, had a normal gait and posture, had no unsteadiness, was able to stand on his heels and toes with slight difficulty, and had a normal straight leg raise.  Dr. Bakdash remarked that Mr. Cross sometimes had difficulty performing minor tasks but was able to make a fist with each hand.  Also, Mr. Cross was able to grasp, lift, carry, and manipulate objects in both hands, and to perform repeated movements with both feet.  R. 102-3.  He could bend over without restriction and squat, sit, stand, and walk normally, although he had difficulty rising from a squatting position.  Dr. Bakdash noted that Mr. Cross' range of motion in his spine, upper extremities, and lower extremities was within the normal range.  R. 104.

On April 14, 2004, Dr. J. Gaddy completed a Physical Residual Functional Capacity Assessment based on the evidence available in Mr. Cross' medical file.  R. 105-12.  Dr. Gaddy opined that Mr. Cross was able to lift fifty pounds occasionally and twenty-five pounds frequently, and that other than these restrictions, Mr. Cross' ability to push and pull with his hands or feet was unlimited.  R. 106.  He indicated that Mr. Cross was able to stand or walk for about six hours in an eight hour work day with normal breaks, but was able to sit for less than six hours in an eight hour work day.  R. 106.  Dr. Gaddy believed

that Mr. Cross suffered from no postural, manipulative, visual, communicative, or environmental limitations.  R. 107-09.


On October 31, 2005, Dr. Haroon Qazi, a consulting reconstructive hand surgeon, examined Mr. Cross.  R. 116-17.  Dr. Qazi described Mr. Cross as appearing to be in "some acute distress."  Dr. Qazi did not examine Mr. Cross' lower body. R. 116.  Dr. Qazi reported that Mr. Cross suffered chronic pain and intolerance to cold in his left leg below the knee stemming from the accident that had broken his left tibia. R. 116.  Dr. Qazi noted that Mr. Cross had suffered from problems with both hands since 1998, and at the time of his consult with Dr. Qazi, Mr. Cross complained of pain in both wrists and hands and limited feeling in his wrists and fingers.  R. 116.  Mr. Cross related to Dr. Qazi that he lacked strength in both hands and suffered from radiating pain from the side of his wrists to both hands.  R. 116.  Dr. Qazi noted the "obvious" presence of Heberden's nodules, caused by rheumatoid arthritis, affecting Mr. Cross' right elbow and left thumb. R. 116.  Although Dr. Qazi did not examine any x-rays, he remarked that Mr. Cross had obvious subluxation of his radiocarpal joints in both wrists.  Mr. Cross' range of motion was severely limited at his wrist but he had adequate range of motion in the small joints of his fingers.  R. 116.  His grip strength was zero to two pounds, and his pinch strength was two pounds on his left hand and five pounds on his right hand.  In sum, Dr. Qazi wrote, "this patient is completely disabled as there is very little useful function in both hands.  We do advise that patient should consult a rheumatologist which will help somewhat with the pain

but again, I do not expect any miraculous recovery resulting in any useful return to any job." R. 117.

II.   *Testimony at the Hearing*

On October 11, 2005, Mr. Cross testified that he retained use in his right arm, estimating that he was able to use his right arm "about half" of what he once could. R. 144. Mr. Cross denied being able to lift anything with his left hand, and he estimated that he would be able to lift and carry up to ten or twenty pounds with his right hand. R. 150. He stated that he was right handed, and was able to write his name, but that in order to write a paragraph, he would have to take a break. R. 144-45. He said that he could not hold a coffee cup with his left hand but could slowly wiggle and painfully straighten the fingers on that hand. R. 145. He testified that he could not cut a two-inch steak and could not hold a spoon in his left hand, but could hold a spoon in his right hand. R. 145. He guessed that he would be able to hammer one or two nails with his right hand before needing to stop, and would not be able to change a flat tire. R. 151. He stated that he did not have full range of motion in his right wrist and was only barely able to move his left wrist. R. 151. To take care of his personal needs like dressing, he had "learned a life of one handedness." R. 145. He was able to button and zip his clothes with his right hand but not with his left hand. R. 145-46. He was able to drive a distance of sixty miles but would be exhausted. R. 146.

Mr. Cross also testified that he suffered from numbness in his left leg from his toes to his thigh.  R. 148.  He stated that he was unable to run and could walk for only fifteen or twenty minutes before he had to sit down and rest for five to ten minutes before walking again.  R. 148-49, 162.  He estimated that in an eight hour work day, he would be able to be on his feet either standing or walking for two to four hours.  R. 149, 162.  He estimated that he would be able to sit for about half an hour to an hour without needing to get up.  R. 163.

Mr. Cross testified that he had growths on his left elbow, right thumb, and on one of his little toes.  R. 154.  The growth on his left thumb was a quarter inch or a half inch on the inside, and the growth on his left elbow had been there for a few years and was growing.  R. 154.  Mr. Cross stated that these growths caused him pain when he bumped them.  R. 155.

Mr. Cross testified that he spent his days watching television, reading newspapers and magazines, and doing light housework such as cleaning up, making the bed, taking out the trash, and cooking quick meals that did not require opening jars.  R. 163.

Mr. Cross testified that he was examined by Dr. Batt in December 2002, and by Dr. Bakdash in March 2004, and stated that since March 2004 he had participated in a pain and stress management course but had received no other medical treatment.  R. 161.  In his pain and stress management course he learned

how to control his pain through relaxation and meditation, but he was not prescribed any medications.  R. 161-62.  He had not been offered any prescription medications, but would refuse them because he feared becoming addicted.  R. 162.

Mr. Cross testified that his condition on the date of the hearing was worse than it had been between August 2002 (when he last worked) and August 2003. R. 158.  Mr. Cross testified, however, that his condition on the date of the hearing was "roughly the same" as it had been when he was examined by Dr. Bakdash in March 2004.  R. 142-43.

Ruth Van Vleet, a vocational expert, also testified at the hearing.  She testified that a hypothetical individual of Mr. Cross' age, education, and vocational background who was able to do medium work but was limited to using only the dominant hand could work as a light delivery driver, unarmed security guard, or telemarketer.  R. 168-71.  If, however, the hypothetical individual was able to use his or her dominant hand for only ten minutes and then had to take a fifteen minute break, the individual could work as a light delivery driver or unarmed security guard.  R. 172.  If the hypothetical individual was able to walk or stand for only fifteen minutes at a time before needing a ten minute break, Ms. Van Vleet testified that the individual would not be able to work as either a light delivery driver or an unarmed security guard.  R. 173.

*Framework for Determining Disability and the Standard of Review*

To be eligible for the disability insurance benefits and supplemental security income he seeks, Mr. Cross must establish that he suffered from a disability within the meaning of the Social Security Act.  To prove disability under the Act, the claimant must show that he is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than 12 months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  Mr. Cross was disabled only if his impairments were of such severity that he was unable to perform work that he had previously done and if, based on his age, education, and work experience, he also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to him in his immediate area, or whether he would be hired if he applied for work.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

To determine whether Mr. Cross was disabled under the Social Security Act, the ALJ followed the familiar five-step analysis set forth in 20 C.F.R. § 404.1520 and § 416.920.  The steps are as follows:

(1)   Has the claimant engaged in substantial gainful activity?  If so, he was not disabled.

(2)   If not, did the claimant have an impairment or combination of impairments that are severe?  If not, he was not disabled.

(3)   If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)   If not, could the claimant do his past relevant work?  If so, he was not disabled.

(5)   If not, could the claimant perform other work given his residual functional capacity, age, education, and experience?  If so, then he was not disabled.  If not, he was disabled.

See generally 20 C.F.R. §§ 404.1520, 416.920.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

The ALJ found that Mr. Cross satisfied step one.  He had not engaged in any substantial gainful activity at any time relevant to the ALJ's decision.  At step two, the ALJ found that Mr. Cross had the following severe impairments:  status post fractures of his left tibia, rheumatoid arthritis, and tumor necrosis.  These impairments did not meet or equal any of the listings that would have

automatically qualified Mr. Cross for benefits at step three.  At step four, the ALJ determined that Mr. Cross was no longer able to perform his past relevant work.

At step five, the ALJ determined that Mr. Cross retained the residual functional capacity to perform medium exertional work that did not require him to use his non-dominant left hand.  Based on the testimony of the vocational expert, the ALJ found that a person with Mr. Cross' residual functional capacity would be able to work as a light messenger driver, telemarketer, or a security guard.  The ALJ therefore denied benefits.

The Social Security Act provides for judicial review of the Commissioner's denial of benefits.  42 U.S.C. §§ 405(g), 1383(c)(3).  Because the Appeals Council denied further review of the ALJ's findings, the ALJ's findings are treated as the final decision of the Commissioner.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court.  42 U.S.C. §§ 405(g), 1383(c)(3); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). The ALJ's decision must be based upon consideration of all the relevant evidence, and the ALJ must articulate at some minimal level her analysis of the evidence so that the court can trace adequately the path of the ALJ's reasoning. *Diaz*, 55 F.3d at 307-08.

## Discussion

I.    *Opinions of the Consulting Physicians*

Mr. Cross argues that the ALJ wrongfully gave greater weight to the opinion of Dr. Bakdash, the consulting physician who evaluated Mr. Cross on March 31, 2004, than to the opinion of Dr. Qazi, the consulting physician who evaluated him on October 31, 2005. Pl. Br. at 4-5. Mr. Cross believes that the ALJ erred by treating these two physicians' opinions as contradictory. He argues that instead

the ALJ should have considered these opinions as evidence of the progression of his condition.

Based on this record, Mr. Cross' theory that the differing opinions of Dr. Bakdash and Dr. Qazi support an inference regarding the deterioration of his condition does not show a reversible error by the ALJ.  On October 11, 2005, only twenty days before he was examined by Dr. Qazi, Mr. Cross testified that his condition then was "roughly the same" as it had been in March 2004 when he was examined by Dr. Bakdash.  R. 142-43.  Mr. Cross' argument that the difference of opinion between Dr. Bakdash and Dr. Qazi could be evidence of the progression of his condition is contradicted by his statement at the hearing and finds no other support in the record.  Here, the ALJ did not err in considering the opinions of Dr. Bakdash and Dr. Qazi as conflicting, without speculating about the possible interim progression of Mr. Cross' condition.

In the face of those conflicting opinions, the ALJ had the discretion – even the obligation – to weigh them against one another.  See *Caviness v. Apfel*, 4 F. Supp. 2d 813, 824 (S.D. Ind. 1998).  Social Security regulations confirm that the ALJ has the discretion to weigh conflicting medical opinions.  See 20 C.F.R. §§ 404.1527, 416.927.  In weighing conflicting medical opinions, the ALJ is obligated to take several factors into consideration, including whether the source has examined the claimant, whether the source is a treating physician, whether the opinion is properly supported, whether the opinion is consistent with the

record as a whole, and whether the source of the opinion is a specialist.  See 20 C.F.R. §§ 404.1527(d); 916.927(d).  In any case, the ultimate responsibility for determining disability remains with the Commissioner or ALJ.  See 20 C.F.R. §§ 404.1527(e)(1); 916.927(e)(1).

Here, the ALJ explained that she gave greater weight to the opinion of Dr. Bakdash because he was a specialist and because his opinion was consistent with the other evidence available in the record.  R. 21.  In contrast, Dr. Qazi was not a specialist and Dr. Qazi's opinion conflicted with the opinions of the other examining sources.  R. 21.  Dr. Qazi's opinion also conflicted with Mr. Cross' own testimony, in which he stated that his condition on the date of the hearing was "roughly the same" as it was when he was examined by Dr. Bakdash and that he retained some residual capacity in his right arm.  R. 142-44.  This was a reasonable explanation for the ALJ's resolution of the conflict.  The ALJ did not err in giving greater weight to the consulting opinion of Dr. Bakdash and discounting Dr. Qazi's opinion that Mr. Cross was totally disabled.

II.     *Credibility Determination*

Mr. Cross also asserts that it was improper for the ALJ to discount his credibility based on his failure to seek medical care or to take medication for his condition.  Pl. Br. 5-7.  The ALJ found that Mr. Cross' statements regarding his symptoms and resulting limitations were not fully credible because Mr. Cross

failed to pursue health care consistent with the degree of disability he claimed, noting that Mr. Cross provided no evidence of seeking or receiving treatment since his claimed onset date and that he took no medication to alleviate his condition. R. 21.  Although Mr. Cross claimed that he was unable to afford treatment and had no medical insurance, the ALJ noted that Mr. Cross received unemployment benefits from August 2002 to about July 2003 and was actively seeking work during this period. R. 21.  The ALJ ultimately concluded that "without reasonable justification, the claimant made no significant efforts to obtain regular medical care that could have improved functional capacities.   His alleged pain and limitations are not corroborated by the objective medical evidence of record."  R. 21.  Mr. Cross argues that the ALJ erred in finding that his testimony was not credible on this basis.

Objective medical evidence is not necessary to support a claimant's allegations regarding the extent of his or her claimed symptoms, but neither the ALJ nor this court is "required to give full credit to every statement of pain, and require a finding of disabled every time a claimant states that she feels unable to work."  *Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996); *Pope v. Shalala*, 998 F.2d 473, 486 (7th Cir. 1993); accord, 20 C.F.R. §§ 404.1529(d), 416.929(d).

The ALJ must weigh the claimant's subjective complaints and the relevant medical evidence, as well as any other evidence of the following factors:

(1)     The claimant's daily activities;

(2)     Location, duration, frequency, and intensity of pain or other symptoms;

(3)     Precipitating and aggravating factors;

(4)     Type, dosage, effectiveness, and side effects of any medication;

(5)     Treatment, other than medication, for relief of pain or other symptoms;

(6)     Other measures taken to relieve pain or other symptoms;

(7)     Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).


Having considered these factors, which are intended to either corroborate or discredit the claimant's subjective complaints, the ALJ may make a reasoned credibility determination based upon the evidence about whether the claimant acts, day in and day out, like a person would act who is really suffering from the symptoms the claimant alleges.  The court will not set aside an ALJ's credibility determination if there is some support in the record unless it is "patently wrong." *Luna*, 22 F.3d at 690; *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).  This deference to an ALJ's credibility determination is especially justified when  it "involves inarticulable elements 'that leave no trace that can be discerned in this or any other transcript.'"  *Herron*, 19 F.3d at 335, quoting *Erhart v. Secretary of Health and Human Servs.*, 969 F.2d 534, 541 (7th Cir. 1991).  "However, when such determinations rest on objective factors or fundamental implausibilities

rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision." *Herron*, 19 F.3d at 335, citing *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

The ALJ considered the factors described above in determining the weight to give Mr. Cross' account of his symptoms and limitations and found his subjective complaints "not fully credible." R. 21. In making this credibility determination, the ALJ considered Mr. Cross' testimony in light of the existence of inconsistent medical evidence and Mr. Cross' failure to pursue any medical treatment. Mr. Cross was diagnosed with rheumatoid arthritis in December 2001, and although examined by two consulting physicians since that diagnosis, the ALJ found that Mr. Cross had received absolutely no treatment for his condition and took no prescribed medications. Mr. Cross claimed that he was unable to afford treatment and had no medical insurance, but the ALJ noted that from August 2002 to about July 2003, Mr. Cross received unemployment benefits and was actively seeking employment. R. 21. Given this, the ALJ found that Mr. Cross' lack of treatment and medication was inconsistent with his claim of debilitating limitations and disability. R. 21.

Many courts, including the Seventh Circuit, have questioned the relevance of a claimant's failure to seek medical treatment, especially when he or she is unable to afford it. See, *e.g.*, *Herron v. Shalala*, 19 F.3d at 336 & n. 11 ("Lack of discipline, character, or fortitude in seeking medical treatment is not a defense to

-17-

a claim for disability benefits."), citing *DeFrancesco v. Bowen*, 867 F.2d 1040, 1044 (7th Cir. 1989); *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989) (ALJ should consider in first instance whether lack of financial resources is claimant's motivation for failing to seek medical attention); *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) (discrediting claimant's complaints of disabling pain was erroneous where claimant's testimony that she could not afford further treatment was uncontradicted by the record).

Here, the ALJ considered Mr. Cross' testimony that he was unable to afford treatment but found that testimony to be contradicted by his receipt of unemployment benefits from August 2002 to about July 2003.  R. 21.  This minimal review of Mr. Cross' ability to afford treatment might otherwise be insufficient to dismiss altogether his subjective account of his condition and limitations, but Mr. Cross failed to present any evidence to support his assertion that he was unable to afford treatment.  Additionally, Mr. Cross' failure to seek medical treatment was not the only basis on which the ALJ discounted Mr. Cross' subjective account.  The ALJ also considered Mr. Cross' testimony concerning his daily activities, his testimony that he actively sought employment while he claimed to be totally disabled, his refusal to take medication, and the available objective medical evidence.  R. 21.  This evidence, in total, provided sufficient grounds for the ALJ's conclusion that Mr. Cross' subjective account of his limitations was inconsistent with the weight of the available objective evidence.  R. 21.  The ALJ

did not err by finding that Mr. Cross' testimony concerning his functional limitations was not fully credible.

III.   *Residual Functional Capacity*

Mr. Cross argues that the ALJ erroneously failed to provide support for his determination that Mr. Cross was unable to use his non-dominant left hand and was capable of performing medium exertional work. Pl. Br. 7. Mr. Cross points to the opinion of Dr. Qazi, who in October 2005 opined that Mr. Cross had no useful function in either of his hands. Mr. Cross argues that the ALJ's failure to consider this line of evidence was error. Pl. Br. 7.

Mr. Cross is correct that an ALJ must consider all lines of evidence in reaching his or her determination. See *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). However, here the ALJ did not fail to consider a line of evidence. As explained above, the ALJ discussed and considered Dr. Qazi's opinion but ultimately gave it little weight. R. 21. In doing so, the ALJ explained that Dr. Qazi was not a specialist and that Dr. Qazi's opinion conflicted with the other evidence available in the record. R. 21. As noted, Dr. Qazi's opinion conflicted with Mr. Cross' own testimony that his condition on the date of the hearing was "roughly the same" as it was when he was examined by Dr. Bakdash, and that he retained some residual capacity in his right arm. R. 142-44. Giving

little weight to evidence is very different from altogether failing to consider evidence, and Mr. Cross' argument fails.

Mr. Cross also argues that it is impossible to ascertain the ALJ's rationale for her ultimate determination regarding his residual functional capacity. The court disagrees. In establishing Mr. Cross' residual functional capacity, the ALJ explained her reliance on Mr. Cross' testimony that his left, non-dominant arm is "useless" but that he retains limited use of his dominant right arm and hand, and on the opinion of Dr. Bakdash. R. 21. On this record, the ALJ's articulation of her analysis was sufficient.

*Conclusion*

For the foregoing reasons, the ALJ's decision denying benefits is supported by substantial evidence and does not reflect a legal error that would require remand. Accordingly, the decision is affirmed and final judgment will be entered.

Date: February 29, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Tom Kieper

UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov